**T.R. and E.M.R., on behalf of N.R., a minor, Plaintiffs,**

v.

**KINGWOOD TOWNSHIP BOARD OF EDUCATION, Defendant.**

Civil Action No. 97–2129 (MLC).

United States District Court, D. New Jersey.

Dec. 23, 1998.

Michaelene Loughlin, Loughlin & Latimer Hackensack, NJ, for Plaintiffs.

Brian J. Duff, Lamb, Hartung, Kretzer, Reinman & DePascale, Jersey City, NJ, for Defendant.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on the cross-motions by plaintiffs and defendant for summary judgment.[1] For the reasons stated in this Memorandum and Order, the Court denies plaintiffs' motion and grants defendant's motion.

### BACKGROUND

This case arises under the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1415(e)(2). Plaintiffs T.R. and E.M.R. ("the parents") are the parents of N.R., who was born on September 7, 1991. (Compl. ¶ 5; Certif. of Leslie Callanan (hereinafter "Callanan Certif.") ¶ 3.) N.R. was classified as preschool handicapped in 1994. (Compl. ¶ 7; Callanan Certif. ¶ 8.) During the 1994–95 school year, N.R. was placed with his parents' consent in a preschool handicapped program and received speech, occupational, and physical therapy. (*Id.*)

In the spring of 1995, defendant Kingwood Township Board of Education ("the Board") proposed an Individualized Education Program ("IEP") for the 1995–96 school year under which N.R. would be placed in a preschool class at the Kingwood School; the class was to comprise an equal number of disabled and nondisabled children. (Callanan Certif. ¶ 8.) The parents rejected the placement and enrolled N.R. at Village Montessori School, a private preschool, in September 1995. (Compl. ¶ 11; Callanan Certif. ¶ 8.) They then filed for due process. In November 1995, the Board and the parents entered into a settlement agreement. (Compl. ¶ 11; Callanan Certif. ¶ 9.) Under the settlement, the parents agreed to pay

---

1. The parties' motions for summary judgment merely present in motion form the review task that the Court is obligated by statute to perform. *Cf. Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir.1994) ("When a party moves for summary judgment in such a judicial-review proceeding, he does not implicitly reserve a right to a trial if the motion is denied; there is no right to a trial in a review proceeding, as contrasted with an original proceeding. The motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record."). Plaintiffs' labeling of their motion as a "motion for partial summary judgment" therefore does not affect our analysis.

Village Montessori School's tuition and provide for N.R.'s transportation. (Compl.¶ 17.) They also promised to help develop an IEP for the remainder of the school year. (Tr. 1 at 46.)[2] The Board agreed to provide speech, occupational, and physical therapy and to hire an educational consultant, Dr. Theresa Bologna ("Dr.Bologna"), who was recommended by the parents. (*Id.* at 44.)

On January 26, 1996, the director of Village Montessori School informed T.R. and E.M.R. that N.R. would not be accepted for summer or fall classes. (Compl.¶ 19.) The parents decided that it was in N.R.'s interest to transfer him to a new school as soon as possible. (*Id.*) Upon learning of the parents' plans to move N.R., the Board again proposed that N.R. be placed in the Kingwood School. (Ex. R–11: Ltr. from Gaetano M. DeSapio, Esq. to Michaelene Loughlin, Esq. dated 3–28–96.) On March 29, 1996, the parents moved N.R. from Village Montessori School to Rainbow Rascals Learning Center ("Rainbow Rascals"). (Compl.¶ 11.) The Board provided N.R. with speech, occupational, and physical therapy at Rainbow Rascals until June 21, 1996. (Callanan Certif. ¶ 11.)

During this period, the parties worked on an IEP that would cover the remainder of the 1995–96 school year. The parties held meetings on April 23, 1996 and May 21, 1996. (Compl.¶ 26.) The parents did not sign the proposed 1995–96 IEP because it provided for a termination date of June 21, 1996 for the related services. (*Id.* ¶ 27.) The 1995–96 IEP draft did, however, reflect the considerable input of the parents and their consultant Dr. Bologna. (*See* Tr. 1 at 53–55; Tr. 3 at 92–93; Tr. 7 at 7.)

The parents also requested that the Board discuss the parents' desire to have N.R. participate in an extended school year program.

(Compl.¶¶ 72–78.) Dr. Eugene Bradford, the Interim Superintendent of Schools, ("Dr.Bradford") informed the parents that the decision would be made after the Board received the evaluations that were underway to determine whether N.R. would remain classified as handicapped. (Compl.¶ 76.) Dr. Bradford wrote to the parents on June 6, 1996 to inform them that their request for an extended school year program had been denied because N.R.'s therapists did not believe that he would severely regress without a summer program. (Ex. R–15.) Dr. Bradford also stated that the parents could discuss the issue at a meeting with him, Dr. Leslie Callanan ("Dr.Callanan"), N.R.'s case manager, and Ms. Nelsen, the school's learning consultant. (*Id.*) T.R. presented his reasons why he believed N.R. should have a summer program at a meeting on June 10, 1996, but the Board did not modify its decision. (Tr. 3 at 113–14.)

Kingwood Township's Child Study Team ("CST") and the parents also met on June 18, 1996 to discuss the recently performed evaluations of N.R. During that meeting, the participants discussed the 1996–97 IEP for N.R. The CST conveyed its belief that N.R. had the readiness skills to begin kindergarten in September 1996. (Callanan Certif. ¶ 14.) During the summer of 1996, the parties continued to work on an IEP for N.R. for the 1996–97 school year. Dr. Callanan twice wrote the parents asking for their input concerning the proposed IEP goals and objectives. (Exs.P–29, P–30.) She also informed them that she was awaiting their response to the recommended placement of N.R. in Kingwood's kindergarten program. (Ex. P–29.) When Dr. Callanan finally received a response from the parents by letter dated July

---

**2.** The administrative record was made during the due process hearing, which was conducted during the 1996–97 school year. All factual references in this Memorandum and Order are to that record, except as otherwise noted. There are 8 volumes of hearing transcripts and numerous exhibits in evidence. The exhibits bear markings "J" (joint), "P" (petitioner school district, defendant herein), and "R" (respondent parents, plaintiffs herein). For reference purposes, the transcripts are cited by volume number and page rather than by date, for example, "Tr. 8 at 22–25," according to the following table:

| Vol.No. | Date | Vol.No. | Date |
| --- | --- | --- | --- |
| 1 | 10-24-96 | 5 | 12-6-96 |
| 2 | 10-25-96 | 6 | 12-19-96 |
| 3 | 11-7-96 | 7 | 1-9-97 |
| 4 | 11-20-96 | 8 | 1-23-97 |

29, 1996, (Ex. P–19), she incorporated the material into the draft IEP. (Tr. 1 at 71.)

A meeting to discuss N.R.'s 1996–97 IEP was held on August 2, 1996. At that meeting, T.R. and E.M.R. informed the school district that they did not plan to send N.R. to kindergarten at the Kingwood School in the fall; rather, they planned to have him attend preschool for another year. (Tr. 3 at 79.) After the parents rejected the proposed kindergarten placement, the Board drafted an IEP which provided for placement in Kingwood Township's preschool class, which contains an equal number of disabled and non-disabled children, and forwarded it to the parents by letter dated 8–16–96. (Id. at 83; Pls.' Br. at 12.) The parents rejected this placement by letter dated September 3, 1996, informing the district that N.R. would continue to be enrolled at Rainbow Rascals. (Ex. R–45: Ltr. from T.R. and E.M.R. to Gene Lennon, Chief School Administrator, Kingwood Township School.) They also requested that the district pay for Rainbow Rascals' tuition and provide the related services there. (Id.)

The Board filed for due process, seeking a determination that its 1996–97 IEP provided N.R. with a free appropriate public education ("FAPE"). (Callanan Certif. ¶ 16.) The parents cross-filed for due process and sought emergent relief requiring the district to provide therapy at Rainbow Rascals. T.R. and E.M.R. argued that under the "stay put" provision of N.J. Admin. Code § 6:28–2.7(i), Kingwood Township was "obligated to continue to provide the same services as were provided during the previous academic year." (Callahan Certif., Ex. B.) The ALJ found that the parents were not entitled to emergent relief because an IEP was not in place to which the "stay put" provision could apply. (Order of ALJ Joseph F. Martone dated 10–3–96 at 2.)

T.R. and E.M.R. next filed a motion for emergent relief directing that N.R. be provided with physical, occupational, and speech therapy during the pendency of the due process hearings. The ALJ found that a free appropriate public education was available to N.R. at the Kingwood School. (Callanan Certif., Ex. C: Order of ALJ Bruce R. Campbell dated 10–30–96 at 4.) The ALJ determined that the school district's responsibility to provide related services ended on June 21, 1996 and therefore denied the parents' motion for emergent relief. (Id. at 5.)

Subsequently, on March 13, 1997, the ALJ decided the parties' motions for due process. The ALJ found that Kingwood Township's kindergarten program provided a FAPE for N.R. in the least restrictive environment. (Opinion of ALJ Campbell dated 3–13–97 ("ALJ Op.") at 10.) The ALJ ruled that because the Board had offered N.R. a FAPE, the parents' decision to keep N.R. at Rainbow Rascals "is not a decision for which Kingwood should pay." (Id.) The ALJ further found that neither federal nor state law required the Board to provide services for N.R. at Rainbow Rascals because Rainbow Rascals is not a school as defined in N.J. Stat. Ann. § 18A:46–19.2. (Id. at 11.) The ALJ also ruled that N.R. was not entitled to a summer program because he would not experience significant regression. (Id. at 14, 16.) The ALJ also determined that any procedural deficiencies by the Board were de minimis and did not affect whether N.R. had been provided with a FAPE. (Id. at 14.) He noted that the parents' opinions were adequately presented to the Child Study Team. (Id.) Finally, the ALJ determined that N.R.'s 1996–97 IEP met the statutory requirements. (Id. at 13.) He also ruled that the parents were not entitled to reimbursement for evaluations performed by Dr. Theresa Bologna and Linda Rammler. (Id. at 15.)

T.R. and E.M.R. filed a Complaint in this Court on April 22, 1997 seeking judicial review of the ALJ's decision. They also applied for preliminary injunctive relief directing the Board to provide N.R. with speech, occupational, and physical therapy at Rainbow Rascals and at their home. This Court denied plaintiffs' application for a preliminary injunction by Memorandum and Order dated May 19, 1997. We found that the settlement agreement, which was the last IEP in place for N.R., provided that N.R. would attend Village Montessori School. (Mem. & Ord. at 13.) We noted that: (1) the Board did not agree with the parents' unilateral decision to transfer N.R. to Rainbow

Rascals, and (2) the services delineated in the settlement agreement were tailored to coordinate with N.R.'s placement at the Village Montessorri School. (*Id.*) Accordingly, we found that an IEP was not in effect at the time of our decision. (*Id.* at 14.) We noted that the services provided in the settlement agreement therefore could not be carried forward to N.R.'s new school as a matter of "stay put" entitlement and consequently denied the application for an injunction. (*Id.*)

N.R.'s parents allege that the Board committed both procedural and substantive violations of the IDEA. The parents allege that the school committed a procedural violation of the IDEA by failing to ensure proper parental participation in the decisions regarding the extended school year program and the 1996–97 IEP. (Pls.' Br. at 12–13.) The parents also allege that the Board violated the IDEA in a substantive manner by failing to provide: (1) a "free and appropriate public education" to N.R. for the school year 1996–97; (2) an interim IEP; (3) a program for the summer of 1996; and (4) therapeutic services in his private school placement. (Compl. at 23.) We held oral argument in this matter on March 13, 1998. During the hearing, we granted the parents' request to supplement the record with various materials: (1) transcripts of various meetings recorded by the parents; (2) a certificate of accreditation of Rainbow Rascals by the National Association of Education for Young Children issued on May 15, 1997; and (3) N.R.'s IEP for the 1997–98 school year.

### DISCUSSION

*I. Standard of Review*

■ Section 1415(e) of the IDEA provides that district courts "shall receive the records of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e). Although this provision could be read to permit the district court to review the evidence de novo, disregarding the findings and rulings of the state agencies, the United States Supreme Court has required that federal district courts af-

ford "due weight" to state administrative proceedings in evaluating claims under the IDEA. *See Board of Educ. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *see also Susan N. v. Wilson School Dist.,* 70 F.3d 751, 758 (3d Cir.1995).

■ The Third Circuit has addressed the standard of review to be used by a district court:

[T]he question of the weight due the administrative findings of facts must be left to the discretion of the trial court. The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.

*Susan N.,* 70 F.3d at 758 (quoting *Town of Burlington v. Department of Educ.,* 736 F.2d 773, 791–92 (1st Cir.1984)); *see also Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 527 (3d Cir.1995) ("[D]istrict courts have discretion to determine how much deference to accord the administrative proceedings...."); *Oberti v. Board of Educ.,* 995 F.2d 1204, 1219 (3d Cir.1993) ("[T]he amount of deference to be afforded the administrative proceedings is an issue left to the discretion of the district court."). If the district court chooses to depart from the agency's ruling, it should provide some explanation for its departure. *Carlisle,* 62 F.3d at 527. During our review of the actions of state authorities, we must remember not to substitute our own notions of sound educational policies for those of the school authorities under review. *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034.

*II. Alleged Procedural Violations*

Pursuant to the IDEA, a school district is required to provide a disabled child with a

"free appropriate education." [3]   20 U.S.C. § 1400(c).   The primary mechanism for delivering a free appropriate education is the development of a detailed instruction plan, known as an Individual Education Program ("IEP"), for each child classified as disabled. 20 U.S.C. § 1401(a)(18); *Susan N.,* 70 F.3d at 756.   An IEP consists of, *inter alia,* a specific statement of a student's present abilities, goals for improvement, services designed to meet those goals, and a timetable for reaching the goals via the services.   20 U.S.C. § 1401(a)(20).   In the instant case, the parents allege that the Board violated the procedural requirements of the IDEA in the creation of an IEP for N.R. and the substantive requirement that an IEP provide a free appropriate public education.

■   A court addressing a claim under the IDEA must first determine whether the public agency has complied with the statutory procedures.   *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034.   Congress attached great importance to these procedural safeguards.   *Id.* at 205–206, 102 S.Ct. 3034 ("It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process ... as it did upon the measurement of the resulting IEP against a substantive standard.").

An IEP is created through the efforts of a child study team, consisting of a school psychologist, a learning disabilities teacher-consultant, and a school social worker.   N.J.A.C. § 6:2.8–3.4.   The child study team, parents, school principal, and other staff members collaborate to formulate, review, or revise an IEP for the child.   34 C.F.R. § 300.344–300.345; N.J.A.C. §§ 6:28–2.3, 6.28–3.1.   Parents must be allowed to participate both in the development of the IEP and any subsequent assessments of its effectiveness.   *See* 20 U.S.C. §§ 1400(c), 1412(7), 1415(b)(1)(A), (C), (D), (E), and 1415(b)(2); *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *Rowley,* 458 U.S. at 208, 102

S.Ct. 3034 ("Congress sought to protect individual children by providing for parental involvement in the development of state plans and policies, ... and in the formulation of the child's individual education program.").

The IDEA provides further procedural safeguards to insure the participation of parents of disabled children.   Parents may examine all relevant records concerning evaluation and placement of their children, 20 U.S.C. § 1415(b)(1)(A); must receive prior written notice when a school proposes or refuses to alter a placement, *id.* § 1415(b)(1)(C); may contest decisions regarding the evaluation of their child or the appropriateness of the child's program through an impartial due process hearing, *id.* § 1415(b)(1)(E), 1415(b)(2); may appeal the decision from such a hearing to the state education agency, *id.* § 1415(c); and may obtain state or federal judicial review of the administrative decision.   *Id.* § 1415(e)(2); *see Susan N.,* 70 F.3d at 756.   The above safeguards are designed to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate."   *Honig,* 484 U.S. at 311, 108 S.Ct. 592.

N.R.'s parents challenge several aspects of the procedural process in this matter.   They allege that the Board failed to ensure parental participation in the decision regarding an extended school year and the development of the draft IEP for the 1996–97 school year. (Pls.' Br. at 12–13.)   We will address these contentions separately.

### A.   *Creation of the 1996–97 Draft IEP*

■   The parents object that the Board forwarded the final 1996–97 draft IEP to the parents by letter dated August 16, 1996. (Pls.' Br. at 12.)   They argue that the IEP must be created at an IEP meeting attended by the parents.   (*See* Pls.' Reply Br. at 4; Hr'g of 3–13–98.)

---

**3.**   New Jersey fulfills its IDEA obligations through statutes codified at N.J. Stat. Ann. ("N.J.S.A.") §§ 18A:46–1 to 46–46 and regulations codified, at the time of the events in dispute, at N.J. Admin. Code ("N.J.A.C.") §§ 6:28–1 to –11.   We

note that the regulations have been modified and are now codified at N.J.A.C. §§ 6A:14–1 to –10. We will refer to the regulations in effect before their modification, as those are the regulations applicable in this dispute.

The Board alleges that the parents were highly involved in developing the 1996–97 IEP. (Def.'s Br. at 11.) The Board argues that the IEP was developed from information that included the parents' specific input. (*Id.* at 12.) For example, at a meeting on June 18, 1996, the CST recommended a placement in the mainstream kindergarten program and asked the parents for specific input to the proposed IEP. (Tr. 1 at 70.) Dr. Callanan wrote the parents twice during the summer of 1996 to request that they submit papers to be incorporated into the draft IEP. (Exs. P–29, P–30; Tr. 3 at 156–60.) She also testified that the 1996–97 draft contained language taken directly from the parents' input. (Tr. 1 at 72.) Moreover, the parents attended a meeting during the summer with Dr. Callanan and the kindergarten teacher. (Tr. 2 at 52.) The Board further notes that it resubmitted the 1996–97 IEP to reflect the decision by the parents to keep N.R. in preschool for another year and that the 1996–97 draft IEP itself was based on the 1995–96 IEP draft that was developed with much assistance from the parents and their recommended consultant Dr. Bologna. (*See* Tr. 1 at 53–55; Tr. 3 at 92–93; Tr. 7 at 7.) In light of this evidence of parental participation, the ALJ noted that "there were copious exchanges of information. The parties wrote and received responses to numerous letters. There were many telephone calls." (ALJ Op. at 13.)

The relevant question is whether such parental participation satisfies the IDEA's procedural requirement of parental involvement in the IEP process. The Third Circuit's opinion in *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1035 (3d Cir.1993), guides our decision. The Fuhrmanns, the parents of a classified child, argued that the defendant, the East Hanover School Board,

violated the procedural requirements of the IDEA by presenting the parents with an IEP at their child's classification meeting, two months before the first meeting to formulate an IEP. *Id.* at 1036. The parents argued that they were presented with a "done deal." *Id.*

The Third Circuit concluded that the East Hanover School Board did not violate the IDEA because the "Fuhrmanns had an opportunity to participate in the IEP formulation process in a meaningful way." *Id.* The court noted that the draft IEP was discussed at the classification meeting and that the Fuhrmanns made several suggestions as to how the plan might be changed. *Id.* The child study team considered the Fuhrmanns' suggestions and incorporated some of them into the proposed IEP. *Id.* We find the reasoning in *Fuhrmann* equally applicable here. The record demonstrates the extensive involvement of N.R.'s parents in the creation of the 1996–97 IEP. (*See* Tr. 1 at 53–55, 70, 73; Tr. 2 at 52; Tr. 3 at 92–93, 156–60; Tr. 7 at 7; Exs. P–29, P30.) Accordingly, we conclude that the Board did not violate the procedural requirements of the IDEA in regard to the 1996–97 IEP.[4]

■ N.R.'s parents also argue that the decision not to provide an extended school year for N.R. in the summer of 1996 was similarly made without parental participation. They claim that the Board did not hold a meeting to discuss whether N.R. should be provided with a summer program. (Pls.' Br. at 14.) Dr. Bradford wrote to the parents on June 6, 1996 to inform them that their request for an extended school year program had been denied because N.R.'s therapists did not believe he would severely regress without a summer program. (Ex.

---

4. The parents also allege that the Board failed to have present at the August 2, 1996 IEP meeting a representative of the Board with the authority to commit resources in violation of 34 C.F.R. § 300.344(a)(1). (Compl. Request for Relief § 3(D).) When the parents told Dr. Callanan at the meeting that they had decided that N.R. should remain in preschool for another year, Dr. Callanan said she would have to take the decision back to the CST. (Pls.' Br. at 12.) The parents state that a person should have been present at that meeting who could commit the

Board to a new IEP. (*Id.* at 13.) We find that the Board did have representatives at the meeting who could commit the Board to a new IEP, including Dr. Callanan and Eugene Lennon, the new chief school administrator. (Tr. 3 at 77.) Dr. Callanan was only taking the wise step of consulting with the rest of the Child Study Team. We note that only one member of the Child Study Team must be present at an IEP meeting. *See* N.J.A.C. § 6.28–2.3(h)(1)(iv); *Fuhrmann*, 993 F.2d at 1036 n. 4.

R–15.) Dr. Bradford also stated that the parents could discuss the issue at a meeting with him, Dr. Callanan and Ms. Nelsen, the school's learning consultant. (*Id.*) T.R. testified that he made a presentation on June 10, 1996, at a meeting attended by Dr. Bradford and two members of the Child Study Team, as to why N.R. required a summer program. (Tr. 3 at 113–14.) However, the Board did not modify its decision. (*Id.*) We find that the said presentation provided the parents with meaningful participation in the decision not to provide N.R. with an extended school year.[5] *See Fuhrmann,* 993 F.2d at 1036. We thus conclude that the Board did not violate the procedural requirements of the IDEA.

### III. Alleged Substantive Violations

■ We now turn to the allegations that the Board violated the substantive requirements of the IDEA. N.R.'s parents challenge the finding by the ALJ that the 1996–97 IEP provided a "free appropriate public education." We note at the outset that the Board bears the burden of proving the appropriateness of the IEP it has proposed. *Oberti,* 995 F.2d at 1219; *Fuhrmann,* 993 F.2d at 1035 ("[T]he burden of showing that the placement is 'appropriate' rests with the school district.").

### A. Benefit Analysis

■ The IDEA requires only that school districts provide an "appropriate" IEP, gauged by whether the IEP is "sufficient to confer some educational benefit." *Rowley,* 458 U.S. at 200, 102 S.Ct. 3034. School districts need not provide the optimal level of services, or even a level that would confer additional benefits because the IEP required

by the IDEA represents only a "basic floor of opportunity." *Id.* at 201, 102 S.Ct. 3034; *see also Fuhrmann,* 993 F.2d at 1040. Although states may create regulations providing for a higher standard, New Jersey has clearly adopted the federal standard. *See Lascari v. Board of Educ.,* 116 N.J. 30, 47, 560 A.2d 1180, 1189 (1989). The Third Circuit has interpreted *Rowley* to require states to provide children with disabilities more than a trivial or de minimis educational benefit. *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 180–85 (3d Cir. 1988). Thus, our substantive review of the proposed 1996–97 IEP for N.R. must focus upon whether that IEP was sufficient to confer an educational, nontrivial benefit on him.

■ We find that the ALJ correctly ruled that the proposed IEP provided more than a trivial or de minimis benefit to N.R. The Kingwood preschool program consisted of six students, three classified and three unclassified. (Tr. 1 at 76.) The program was supported by on-site therapists that N.R. needed in connection with his IEP. (Tr. 1 at 76–77.) Several witnesses testified that the program could provide a benefit to N.R. Dr. Callanan testified that N.R.'s IEP could be readily implemented through the preschool program. (Tr. 1 at 78.) Dr. Frances Hobbie stated that the preschool program would also suit N.R.'s needs. (Tr. 7 at 118 (noting the benefits of the preschool program including the small class size and the assistance of a full-time aide).) Darlene Johnson, the teacher of the preschool program, also testified that she was familiar with N.R.'s IEP and would implement his IEP on a daily basis within the

---

5. We also find that the Board did not err by failing to provide an extended school year. The parents allege that the ALJ based his decision on the improper standard of "regression without recoupment." (Compl.§ 112(B).) An extended school year must be provided "if it would prevent significant regression of skills or knowledge retained by [the child] so as to seriously affect his progress toward self-sufficiency." *See Cordrey v. Euckert,* 917 F.2d 1460, 1470 (6th Cir.1990) (quoting *Rettig v. Kent City School Dist.,* 539 F.Supp. 768, 778–79 (N.D.Ohio 1981), *aff'd in part, vacated in part on other grounds,* 720 F.2d 463 (6th Cir.1983)). We find that there is no

need to engage in a semantic analysis of the proper standard. We note that the record does not contain evidence that N.R. would experience significant regression without a summer program. The parents' experts only testified that N.R. could especially benefit from a summer program. (*See, e.g.,* Tr. 6 at 37 (testimony of Dr. Bologna noting that N.R. was making good progress and that a summer program would allow him to continue to excel).) In light of the lack of evidence demonstrating regression, we find that the Board did not violate the IDEA by refusing to provide an extended school year program.

preschool program. (Tr. 2 at 145–47; Ex. P–25.)

We also find that N.R.'s period in the resource room would provide him with benefits. Dr. Callanan testified that the resource center would provide additional time for N.R. to work on improving his skills. (Tr. 2 at 32; Tr. 8 at 97.) Dr. Hobbie also testified that the resource center would be helpful to N.R. (Tr. 7 at 135.)

N.R.'s parents mistakenly emphasize that N.R. appeared to excel while at Rainbow Rascals ("RRLC" in plaintiffs' brief) during the end of the 1995–96 school year. (*See* Pls.' Br. at 6 ("Dr. Callanan agreed that N.R. had made significant gains when attending RLLC."); *id.* at 16 ("[Dr. Bologna] further testified that N.R. was thriving at RRLC."); *id.* at 17 ("T.R. testified that N.R.'s needs were being addressed at RRLC."); *id.* at 28 ("Dr. Hobbie agreed with plaintiffs' experts and Dr. Callanan that N.R. made noticeable gains in growth and development at RRLC.").) The parents strongly suggest that Rainbow Rascals would be more beneficial for N.R. than the Kingwood preschool program; however, the relevant analysis is whether the Kingwood preschool provides N.R. with some educational, nontrivial benefit. *See Rowley*, 458 U.S. at 200, 102 S.Ct. 3034. The Board simply does not have to disprove the appropriateness of the alternative IEP suggested by the parents. *See Carlisle*, 62 F.3d at 533 ("Such a requirement would not only impose a very substantial burden on the district, but it would also conflict with *Rowley* and its progeny to the extent that such a general rule would effectively necessitate proof that a district's IEPs were the best rather than simply proof that they conferred some educational benefit.").[6] In sum, the Board has demonstrated that the proposed 1996–97 IEP was "sufficient to confer some educational benefit."

**6.** Similarly, any evidence that N.R. excelled at Rainbow Rascals during the 1996–97 school year is irrelevant. "The measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date.... Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's place-

*B. Least Restrictive Environment Analysis*

The IDEA also requires that a disabled child be placed in the least restrictive environment ("LRE") that will provide the child with an educational benefit. *See* 20 U.S.C. § 1412(5)(B); *Carlisle*, 62 F.3d at 535 ("An IEP must not only be designed to confer some educational benefit, but it also must deliver the programming in the least restrictive educational environment."). "The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *Id.; see also* 20 U.S.C. § 1412(5)(B) (requiring maximal educational integration of disabled children with children who are not disabled, and restricting separate schooling to situations when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily); 34 C.F.R. § 300.552. This congressional mandate, also embodied in federal and state regulations, is known as the "mainstreaming," "inclusion," or "least restrictive environment" requirement of the IDEA. *See Oberti*, 995 F.2d at 1206–07, 1213–15.

The Third Circuit has adopted a two-part test for determining whether a school is in compliance with IDEA's mainstreaming requirement. *Id.* at 1215. First, the Court must determine "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." *Id.* Secondly, if the Court finds that placement outside of a regular classroom is necessary for the child to benefit educationally, then we must decide "whether the school has mainstreamed the child to the maximum extent appropriate, i.e., whether the school has made efforts to in-

ment." *Carlisle*, 62 F.3d at 534 (citing *Fuhrmann*, 993 F.2d at 1040); *see also Fuhrmann*, 993 F.2d at 1037 ("Thus, this court's inquiry is not whether State Street was better for G.F., as it appears to have been, but whether the placement of G.F. in East Hanover's Preschool Handicapped program during 1989–90 was appropriate.").

clude the child in school programs with non-disabled children whenever possible." *Id.*

The *Oberti* court elaborated on the factors to be examined when deciding whether a child should remain in a regular class:

> In sum, in determining whether a child with disabilities can be educated satisfactorily in a regular class with supplemental aids and services (the first prong of the two-part mainstreaming test we adopt today), the court should consider several factors, including: (1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class.

*Id.* at 1217–18.

■ N.R.'s parents argue that the LRE for N.R. was the Rainbow Rascals preschool program. (Pls.' Br. at 27.) The parents contend that the Rainbow Rascals program was the LRE for N.R. in the 1996–97 school year because it was a regular preschool program in which N.R. could receive supplementary services. (*Id.* at 25.) The parents rejected the Kingwood Township preschool program and resource center because, for half of the day, N.R. would be in the segregated environment of a resource center which is for "handicapped children only." (*Id.* at 26.)

The Board first offered a placement in the regular kindergarten program at Kingwood. Both of the Board's experts, Dr. Callanan and Dr. Hobbie, supported such a placement as offering the least restrictive environment. (*See* Tr. 8 at 96–97; Tr. 7 at 125–26, 145–46, 163, 164.) When the parents rejected the kindergarten placement, the Board offered placement in its preschool program as an alternative. The Board's experts appear to acknowledge that, if the district offered a full-day preschool program, the period in the resource center would not be needed. (*See* Tr. 2 at 32–33; Tr. 7 at 186.) However, because the parents sought a full-day placement for N.R., the Board attempted to accommodate that request by placing the child in the resource center for the afternoon.

We find that the Kingwood Township preschool program constituted the next LRE along the continuum of possible placements. First, we note that the Board was not obligated to provide a preschool program for nonhandicapped children. *See* 34 C.F.R. § 300.551 note ("Public agencies that do not operate programs for nondisabled preschool children are not required to initiate such programs solely to satisfy the requirements regarding placement in the LRE.").[7] We also take into consideration the fact that the preschool program cannot be described as a typical "regular class," nor is it a typical special education class; half of the children in the class are nonhandicapped, and any preschool child living in Kingwood Township may apply to attend the program. (Tr. 1 at 133–34.) The record further demonstrates that the children in this class have interaction with nondisabled older children through assemblies and a program where first-graders visit the class. (Tr. 2 at 65.)

■ N.R.'s parents argue that Rainbow Rascals constituted the LRE. However, the Board could not consider Rainbow Rascals as a possible placement because Rainbow Rascals was not accredited by the state. Section 6:28–4.2 of N.J.A.C. lists the continuum of placements in order of restrictiveness. However, each of the listed private placements requires approval or accreditation. *See* N.J.A.C. § 6:28–4.2 (seventh alternative is

7. Federal regulations provide that for public agencies without preschool programs, some alternative methods for meeting the requirements of a LRE include:
   (1) Providing opportunities for the participation (even part-time) of preschool children with disabilities in other preschool programs operated by public agencies (such as Head Start);
   (2) Placing children with disabilities in private school programs for nondisabled preschool children or private school preschool programs that integrate children with disabilities and nondisabled children; and
   (3) Locating classes for preschool children with disabilities in regular elementary schools. *Id.*

"an approved private school for the handicapped," and ninth is "an accredited nonpublic school which is not specifically approved for the education of pupils with disabilities."). It is undisputed that Rainbow Rascals was not accredited at the time the 1996–97 IEP was being formed. (*See* Tr. 1 at 43.) Thus, the Board could not recommend placement at Rainbow Rascals.

Assuming *arguendo* that Rainbow Rascals were accredited, we would nonetheless find that the Kingwood Township preschool program constituted the LRE because of the statutory preference for educating a child in his home school. Both New Jersey and federal regulations state that a public agency should give weight to whether a placement is in the child's home school. *See* 34 C.F.R. § 300.552(c) ("Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled."); N.J.A.C. § 6:28–2.10(a)(7). The parents argue that N.R. would not attend the Kingwood Township preschool if he were nonhandicapped, as he would attend a private preschool. While it may be true that N.R. would attend a private preschool under any circumstances, the aim of the regulations still supports educating preschool children in the local school that they will be attending for elementary school.

Both New Jersey and federal regulations also state that a public agency should give weight to whether a placement is near to the child's home. *See* 34 C.F.R. § 300.552(a)(3) ("Each public agency shall ensure that: [t]he educational placement of each child with a disability is as close as possible to the child's home."); *see also* N.J.A.C. § 6:28–2.10(a)(5) ("Placement of pupils with educational disabilities is provided in appropriate educational settings as close to home as possible."). It is undisputed that Rainbow Rascals is located in a different town 20 to 30 minutes from N.R.'s home. (*See* Tr. 2 at 113.) We find that the location of the Kingwood Township preschool program greatly supports a determination that the program constitutes a placement in the LRE for N.R. *Cf. Fuhrmann*, 993 F.2d at 1038 ("In addition, the CST clearly considered Jointure to be the least restrictive environment as defined in N.J.A.C. § 6:28–2.10. In particular, Jointure is a public school and is closer to G.F.'s home than any of the alternative placement options, including State Street."); *see also Oberti*, 995 F.2d at 1224 n. 31 (noting that federal regulations create a presumption in favor of placing the child, if possible, in the neighborhood school, and if that is not feasible, as close to home as possible). We find that the location of the program, combined with its inclusive properties resulting from the equal mix of handicapped and nonhandicapped students, supports our conclusion that the program constitutes a placement in the LRE for N.R.

We have considered the parents' contention that N.R.'s placement in the afternoon resource center would not constitute the LRE for N.R. However, we find that the facts in this case do not support the parents' argument in that regard. Dr. Callanan testified that the Child Study Team believed that N.R. did not need to have an afternoon program. (*See* Tr. 1 at 78–79.) She explained that the second half of the day was added to accommodate the parents who believed N.R. needed a full-day program. (*Id.*) We have already found that the extra time in the resource center would offer educational benefits to N.R.

Moreover, we decline the parents' invitation to sanction the Board for attempting to accommodate the parents' request for placement in a full-day program under these circumstances. It seems rather ironic to the Court that plaintiffs' counsel maintained at oral argument that the Board should have "stood its ground" in its belief that a half-day program would constitute a FAPE for N.R. and should not have acceded to the parents' wishes. (Hr'g of 3–13–98.) This position conflicts sharply with the parents' allegations that they were denied meaningful participation in the creation of N.R.'s IEP. If we had found that N.R. could only achieve educational benefits, under the *Rowley* standard, by a full-day program, then the relative restrictiveness of the resource center would enter into our analysis. However, the record does not establish that N.R. needed a full-day program to achieve an educational bene-

fit but that such a program could benefit him. (*See* Tr. 4 at 140 (parents' expert Joanne Suomi acknowledges that she did not determine whether N.R. needed a full-day program); Tr. 5 at 39 (parents' expert Dr. Beverly Rainforth noting that N.R. "can benefit" from a longer day).)

### IV. Providing Related Services at a Private School

▆ N.R.'s parents also allege that the Board violated the IDEA by failing to provide related services to N.R. while he attended Rainbow Rascals during the 1996–97 school year. "Related services" are those services which "may be required to assist a handicapped child to benefit from special education...." 20 U.S.C. § 1401(17). These services include transportation and developmental, corrective, and supportive services such as speech pathology, audiology, recreation, psychological services, diagnostic medical services, physical and occupational therapy, and counseling services. *Id.* The parents and the Board agreed on the related services to be provided N.R. under the 1996–97 IEP but did not agree on N.R.'s placement. (Tr. 1 at 120.) The parents contend that the Board should have created an interim IEP providing for the provision of related services until the area of disagreement was resolved. (Pls.' Br. at 33.)

We disagree. First, it is clear that the Board was not compelled to create an interim IEP. A note to the federal regulations provides that the public agency may decide to provide for an interim IEP to be followed until the area of disagreement is resolved. *See* 34 C.F.R., pt. 300, app. C at n. 35. However, the note also states that when the parties disagree about the placement itself, as opposed to a particular related service, "the agency *might* carry out *any one* or all of the following steps: (1) Remind the parents that they may resolve their differences through the due process procedures ...."

(emphasis added). We find that the Board was not compelled to create an interim IEP given the discretionary wording of this Note and the lack of dispute concerning the Board having notified the parents that they may file for a due process hearing.

The parents cite *Russman v. Sobol,* 85 F.3d 1050 (2d Cir.1996) for the proposition that the IDEA requires local school districts to provide services on-site to children attending private school, at least where no cost differential is involved.[8] (*See* Pls.' Br. at 35.) The ALJ relied on *K.R. by M.R. v. Anderson Community Sch. Corp.,* 81 F.3d 673 (7th Cir.1996), which held that public school districts did not have any obligation to provide services on-site to children attending private school. We do not need to determine which of these approaches to adopt because we find that the Board would not be obligated to provide services at Rainbow Rascals even under *Russman.* The *Russman* court held that a school district must provide services at a private school where the cost of special services does not vary. *Russman,* 85 F.3d at 1056–57. The court provided the example of an occupational therapist who can efficiently aid five disabled students. *Id.* If five such students were all attending the same private school, the cost per student of providing an occupational therapist at the private school would be the same as providing one at a public school. *Id.* In the instant matter, however, providing services to N.R. at Rainbow Rascals would not be cost neutral. In particular, the therapists would have to travel to Rainbow Rascals to service just one child. (*See* Callanan Certif. ¶ 17(a).) . Moreover, N.R.'s parents wanted the therapists to be available on a fluctuating basis, which would prevent the therapists from setting regular times to meet with other children. (*Id.*) Accordingly, we find that the Board was not obligated to provide on-site services at Rainbow Rascals in light of the added costs of doing so.[9]

---

8. We note that the IDEA Amendments of 1997 determine that a public agency does not need to provide on-site services to a disabled child enrolled in private school. *See Russman v. Board of Educ.,* 150 F.3d 219, 220 (2d Cir.1998).

9. N.R.'s parents also seek reimbursement for the independent evaluations of N.R. done by Dr. Bologna and Linda Rammler in preparation for the determination whether N.R. was entitled to an extended school year program. (Compl.¶ 96.) A parent may request an independent evaluation if there is a disagreement with the evaluation

.. 

## V. Conclusion

The IDEA grants authority to courts to order school authorities to reimburse parents who unilaterally place their child in a private school where the court "ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *School Comm. of Burlington, Mass. v. Department of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). However, parents who unilaterally change the child's placement while they challenge a proposed IEP bear the risk that the court may determine that the placement is not proper. *Id.* at 373–74, 105 S.Ct. 1996. In the instant matter, the parents made the unilateral decision to place N.R. in a private preschool. We have found that the Board did not violate the IDEA in either its substantive or procedural requirements. Consequently, the parents are not entitled to compensation for the tuition and other costs associated with their decision to place N.R. at the private preschool.

provided by the district board of education. N.J.A.C. § 6:28–2.5(b). The ALJ denied reimbursement for Dr. Bologna after noting that her consultations with the parents began on June 4, 1996, two days before the letter from the Board denying a summer program. (*See* ALJ Op. at 9.) The ALJ also noted that the invoice for Dr. Rammler's report does not state when the evaluation was done. (*Id.;* Ex. R–47.) We agree with the ALJ's determination that the parents are not entitled to reimbursement for said evaluations, as there is no clear evidence that the parents' disagreement with the school board's assessment of N.R. was the catalyst for those independent evaluations.